Slip Op. 17-162

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HUZHOU MUYUN WOOD CO., LTD., | |
| Plaintiff, | Before: Gary S. Katzmann, Judge |
| v. | Court No. 16-00245 |
| UNITED STATES, | **PUBLIC VERSION** |
| Defendant. | |

## OPINION

[Commerce's Final Results are remanded and plaintiff's motion for judgment on the agency record is granted in part.]

Dated: December 11, 2017

Gregory S. Menegaz and Alexandra H. Salzman, deKieffer & Horgan PLLC, of Washington, DC, argued for plaintiff.  With them on the brief was J. Kevin Horgan.  With them on the reply brief were Judith L. Holdsworth.

Tara K. Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Mercedes C. Morno, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC.

Katzmann, Judge: The Trade Facilitation and Trade Enforcement Act of 2015 ("EAPA"),

Pub. L. No. 114-125, 130 Stat. 122 (2016), which was signed into law on February 24, 2016, made

numerous amendments to the antidumping and countervailing duty laws found under Title 19 of

the United States Code.[1]  Relevant here, the EAPA codified the totality of the circumstances test

---

[1] For the purposes of clarification, and lest there be any confusion, the court notes that EAPA is not the same as the Trade Preferences Extension Act of 2015 ("TPEA"), which also made

used by the United States Department of Commerce ("Commerce") to determine whether a transaction is *bona fide* for the purposes of a new shipper review, whereby a shipper seeks exemption from duty liability which would be imposed under an antidumping order and seeks an individual antidumping rate. This case raises questions of procedural fairness and substantiality of record evidence related to the application of that test.

Plaintiff Huzhou Muyun Wood Co., Ltd. ("Muyun Wood"), a Chinese exporter and producer of multilayered wood flooring, contests Commerce's rescission of its new shipper review related to the antidumping duty order on multilayered wood flooring from the People's Republic of China ("PRC"). Muyun Wood New Shipper Review Request ("NSR Request") at Ex. 1, C.R. 3 (June 22, 2015). Specifically, Muyun Wood contends that Commerce abused its discretion by placing data on the record a week before comments were due without clarifying its intended use. Further, Muyun Wood argues Commerce's determination that Muyun Wood's sale was not *bona fide* -- and thus that the new shipper review should be rescinded -- was not supported by substantial record evidence. The United States ("The Government") contends that Commerce did not abuse its discretion and that its conclusions were supported by substantial evidence.

The court concludes that Commerce abused its discretion by adding the data to the record in the manner it did. Further, Commerce's conclusion that Muyun Wood's sale was not *bona fide* and its rescission of Muyun Wood's new shipper review were not supported by substantial evidence. The court thus remands this case to Commerce.

---

amendments to the antidumping and countervailing duty laws. See Ozdemir Boru San, Ve Tlc, Ltd. Sti. v. United States, 2017 WL 4651903, ___ F. Supp. 3d ___ (CIT 2017).

## BACKGROUND

### I.       Anti-Dumping Orders and New Shipper Reviews Generally

Dumping occurs when a foreign company sells a product in the United States for less than fair value -- that is, for a lower price than it sells that product in its home market.  Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).  Because such behavior can undercut American producers selling those goods at market price, Congress enacted the Tariff Act of 1930[2] to give Commerce a framework for detecting dumping and calculating a duty rate that offsets the dumping.  Id.  Either domestic producers or Commerce may initiate an investigation into potential dumping and, if appropriate, Commerce will issue an anti-dumping order which contains the duty rates for the relevant products.  Id.; 19 U.S.C. §§ 1671, 1673.  If a producer or exporter did not export merchandise subject to an antidumping order during the period of investigation, it may request a new shipper review.  19 U.S.C. § 1675(a)(2)(B).  Commerce will conduct company-specific reviews of new exporters and producers that submit properly documented requests for review.  Id.  The "purpose of a new shipper review is to provide an opportunity to an exporter or producer who may be entitled to an individual antidumping rate, but was not active during the period of investigation, to be considered for such a rate."  See Marvin Furniture (Shanghai) v. United States, 36 CIT ___, ___, 867 F. Supp. 2d 1302, 1307 (2012).  The provisions regarding new shipper reviews were enacted as part of the Uruguay Round Agreements Act ("URAA") to address concerns that shippers who did not export merchandise subject to an

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provision of Title 19 of the U.S. Code, 2012 edition.  Citations to 19 U.S.C. § 1675, however, are not to the U.S. Code 2012 edition, but to the unofficial U.S. Code Annotated 2017 edition.  The current U.S.C.A. reflects the amendments made to 19 U.S.C. § 1675 (2012) by the Trade Facilitation and Trade Enforcement Act of 2015 ("EAPA"), Pub. L. No. 114-125, § 433, 130 Stat. 122, 171–72 (2016), which are integral to this case.

antidumping duty order were being deprived of an opportunity to have their dumping margins calculated individually.  "During the negotiations, there was an attempt to exempt new shippers from duty liability by requiring an entirely new antidumping investigation along with a separate finding of injury for each new shipper."  URAA, Statement of Administrative Action, H.R. Doc. No. 103-316, vol.1 at 875 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4203 ("SAA").[3]  Instead, "[t]he United States agreed to a more reasonable proposal . . . to provide new shippers with an expedited review that will establish individual dumping margins for such firms on the basis of their own sales," and accordingly created new shipper reviews.  Id.

Commerce determines the normal value, export price, and resultant dumping margin for each entry of subject merchandise to determine a company's individual rate.  19 U.S.C. §1675(a)(2)(B)(i)–(ii).  However, "any weighted average dumping margin . . . shall be based solely on the *bona fide* sales of an exporter or producer" to the United States.  19 U.S.C. §1675(a)(2)(B)(iv).  The factors that Commerce has historically used to determine whether a sale is *bona fide*, discussed infra, have been codified in § 433 of the EAPA.  In a *bona fide* analysis, Commerce does not attempt to ascertain the fair value of the merchandise, but examines each sale for its commercial reasonableness.  See Hebei New Donghua v. United States, 29 CIT 603, 374 F. Supp. 2d 1333 (2005).  Commerce looks to the nature of the sale to make sure it was sold in a manner reasonably representative of the shipper's future commercial practice, and to ensure that the shipper is not attempting to circumvent the duty order.[4]

---

[3]  The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

[4]  One method for circumventing high antidumping duty rates was to "enter into a scheme to structure a few sales to show little or no dumping" and obtain an expedited new shipper review.

Commerce may rescind a review if it concludes that "there has not been an entry and sale to an unaffiliated customer in the United States of subject merchandise" during the period of review ("POR"), and that "an expansion of the normal period of review to include an entry and sale to an unaffiliated customer in the United States of subject merchandise would be likely to prevent the completion of the review within the [required] time limits." 19 C.F.R. § 351.214(f)(2). "Commerce interprets the term 'sale' in § 351.214(f)(2)(i) to mean that a transaction it determines not to be a *bona fide* sale is, for purposes of the regulation, not a sale at all;" so, if no *bona fide* sales occur during the POR, Commerce may rescind the NSR.  Shijiazhuang Goodman Trading Co. v. United States, 40 CIT __, __, 172 F. Supp. 3d 1363, 1373 (2016).

## II.    Muyun Wood's New Shipper Review

Muyun Wood requested a new shipper review to calculate its dumping duty for its exports during the relevant POR, under the antidumping duty order on multilayered wood flooring from the PRC, on June 22, 2015.  NSR Request.  Muyun Wood filed its Section A response on August 26, 2015 and Section C & D response on September 4, 2015.  Muyun Wood Section A Resp., C.R. 8–10; Muyun Wood Section C & D Resp., C.R. 11–15.  Commerce sent Muyun Wood the first supplemental questionnaire on October 9, 2015.  Muyun Wood First Suppl. Questionnaire, P.R. 42.

---

H.R. Rep. No. 114-114(I) § 433, at 89 (2015). The atypical sales resulted in a zero or low antidumping duty rate, which allowed the importer to bring large quantities of the subject merchandise into the United States at highly dumped prices but with little or no cash deposit. Id. The importer could disappear or become nonresponsive by the time Commerce conducted an annual review of those subsequent sales and assigned the final duty rate, leaving Customs and Border Protection unable to collect the duties. Id.

Commerce placed data from the sales databases of two mandatory respondents[5] -- Dalian

Dajen Wood Co., Ltd. and Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao") --

from the second administrative review ("AR2") of the multilayered wood flooring antidumping

duty order.  Dep't Letter: U.S. Sales Data from the AR2, P.R. 64, C.R. 52–54 (Apr. 12, 2016)

("AR2 data").  Commerce also indicated that any comments on the data had to be submitted by

5:00 PM on April 19, 2016 at the latest, and that the data constituted business propriety information

and could not be shared with any party without Administrative Protective Order ("APO")

access.  Id.

The next day, Muyun Wood and the other participant in the new shipper review -- Dongtai

Zhangshi Wood Industry Co., Ltd. ("Zhangshi") -- requested that Commerce clarify how it

intended to use the AR2 data and issue a supplemental questionnaire.  Muyun Wood Clarification

Letter, P.R. 65 (Apr. 13, 2016); Zhangshi Clarification Letter, P.R. 66 (Apr. 13, 2016).  Muyun

Wood also asked for an extension of time to comment, "to a date after the Department has had the

---

[5] In antidumping duty investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f-1(c)(2), which provides:

> If it is not practicable to make individual weighted average dumping margin determinations [in investigations or administrative reviews] because of the large number of exporters or producers involved in the investigation or review, the administering authority may determine the weighted average dumping margins for a reasonable number of exporters or producers by limiting its examination to—
>
> (A) a sample of exporters, producers, or types of products that is statistically valid based on the information available to the administering authority at the time of selection, or
>
> (B) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.

opportunity to issue a supplemental questionnaire to Muyun, and Muyun has had a chance to respond to the Department's supplemental questionnaire." P.R. 65. Commerce replied that it was unable to grant Muyun Wood's request for an extension of time to comment on the data "[d]ue to statutory deadlines." Dep't of Commerce Resp. to Clarification Request, P.R. 70 (Apr. 15, 2016) ("Resp. to Clarification Request"). Commerce stated that comments on the AR2 data remained due on April 19, 2016 at 5:00 PM, and indicated that the "data may be used as part of the Department's analysis in this new shipper review." Id.

Muyun Wood submitted its comments on the AR2 data on April 19, 2016. Muyun Wood Comments on AR2 Data at 1, P.R. 72 ("Muyun Wood Comments"). Muyun Wood stated that the data appeared irrelevant to its case because it included sales data from companies other than Muyun Wood for a POR earlier than the one during which Muyun Wood's sale took place. Id. Muyun Wood also noted that its Chinese counsel was unable to access the APO -- and thus the AR2 data -- until after the close of business on April 19, 2016. Id. at 2. Zhangshi made similar complaints in its comments on the AR2 data that same day. Zhangshi Comments on AR2 Data at 1–5, P.R. 73 (Apr. 19, 2016). Commerce sent Muyun Wood second and third supplemental questionnaires on April 22, 2016 and May 18, 2016, respectively. Muyun Wood Second Suppl. Questionnaire, P.R. 74; Muyun Wood Third Suppl. Questionnaire, C.R. 59.

Commerce issued its Preliminary Results on May 31, 2016. Multilayered Wood Flooring From the People's Republic of China, 81 Fed. Reg. 34,310 (Dep't of Commerce May 31, 2016), and accompanying Preliminary Decision Memorandum (May 20, 2016) ("PDM"), C.R. 61. Commerce found that Muyun Wood's sale was not *bona fide* for the purposes of the antidumping law. PDM at 1. Commerce indicated that it based this decision on: (1) the price of Muyun Wood's

sale being higher[6] than the highest priced sale of a Senmao CONNUM[7] from the AR2 with six of

seven matching product characteristics and what Commerce viewed as significantly higher[8] than

the average of the Senmao CONNUM; (2) the sale occurring late in the POR after a short

negotiation; and (3) Muyun Wood's inability to show that its U.S. customer[9] resold its product for

a profit. <u>PDM</u> at 1–7.

Muyun Wood submitted its case brief on July 7, 2016. Muyun Wood Case Br., C.R. 63.

Muyun Wood argued that its sale was *bona fide* because the difference in price between its product

and the Senmao CONNUM could be explained by differences in the products' characteristics and

changes in the market since the AR2, and that the sale did in fact follow commercial norms. <u>Id.</u> at

10–12. Muyun Wood also provided additional information to support its contention that its U.S.

customer resold Muyun Wood's product for a profit. <u>See</u> Muyun Wood Third Suppl.

Questionnaire Resp. at Exhibit SQ3-1, C.R. 59 (May 18, 2016). Commerce placed two public

*bona fide* memoranda from previous new shipper reviews on the record as evidence of

Commerce's practice in determining *bona fide* sales in new shipper reviews. Placing on Record

Bona Fide Sales Dep't Practice Memorandum, P.R. 103 (Oct. 19, 2016).

---

[6] By [[      ]].  "[[   ]]" denotes information designated by a party as business proprietary information, which is not disclosed in the published opinion. Section 777 of the Tariff Act of 1930 prohibits disclosure of information "designated as proprietary by the person submitting the information" absent consent.  19 U.S.C. § 1677f (b)(1)(A) (2000).  The business proprietary information is provided in the confidential version of the opinion issued to the parties. <u>See</u> USCIT Rule 73.2.

[7] Sales of individual products are denominated by product control numbers denoted as "CONNUM" entries.

[8] By [[        ]].

[9] The U.S. customer in question was [[                                    ]].

In its Issues and Decision Memorandum for the final results of the new shipper review ("IDM") -- dated October 17, 2016 -- Commerce concluded that Muyun Wood's sale was not *bona fide* and that the new shipper sale should be rescinded. IDM at 24, P.R. 102, C.R. 67. Based on new information, Commerce revised its view that Muyun Wood could not demonstrate that its U.S. customer sold Muyun Wood's product at a profit. IDM at 21. Commerce also agreed with Muyun Wood that the short sales negotiation was not atypical, given prior communication between Muyun Wood and its U.S. customer at a trade show. Id. However, Commerce continued to find that the sale was not *bona fide* due to the price difference between Muyun Wood's product and the Senmao CONNUM. Id. at 17–18. In addition, Commerce found that Muyun Wood had received payment from its U.S. customer nine days late, which it viewed as undermining the *bona fide* nature of the sale. Confidential Issues and Decision Memorandum ("Confidential IDM") at 34, C.R. 67 (Oct. 17, 2016). Commerce also stated that the fact that Muyun Wood made only one sale to the United States during the POR weighed against finding that the sale was *bona fide*. Id. at 10–11. Commerce published its rescission of the new shipper review in the Federal Register on October 26, 2016, and also stated that Muyun Wood would remain part of the PRC-entity for the purpose of assessing duties. Multilayered Wood Flooring from the People's Republic of China: Rescission of Antidumping Duty New Shipper Reviews, 81 Fed. Reg. 74,393, 74,393–94.

Muyun Wood filed this action against the Government on November 10, 2016. ECF No. 1. It moved for judgment on the agency record on April 24, 2017. ECF No. 17. The Government responded to Muyun Wood's motion on June 30, 2017, and Muyun Wood filed its reply on July 28, 2017. ECF No. 22; ECF Nos. 23–24. The Joint Appendix was filed on August 11, 2017, and Oral Argument was held on November 16, 2017. ECF Nos. 25–26; ECF No. 33.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) (2012), and 19 U.S.C. § 1516a(a)(2)(A)(i)(II), and will sustain Commerce's antidumping subsidy determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); <u>Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States</u>, 701 F.3d 1367, 1374 (Fed. Cir. 2012).

## DISCUSSION

Muyun Wood has raised essentially three issues in this action: (1) whether Commerce abused its discretion by adding the AR2 data to the record one week before the end of the comment period without clarifying its intended use; (2) whether there was substantial evidence supporting Commerce's determination that Muyun Wood's sale was not *bona fide*; and (3) whether Commerce's application of the PRC-entity rate was supported by substantial evidence or otherwise in accordance with law. Pl.'s Br. at 1. For the reasons detailed below, the court concludes that: (1) Commerce's addition of the AR2 data is an abuse of its discretion; and (2) Commerce's determination that Muyun Wood's sale was not *bona fide* is not supported by substantial evidence. Consequently, remand to Commerce is in order, and the court need not and does not consider whether application of the PRC-entity rate is appropriate.

### I.      Commerce Abused Its Discretion by Adding the AR2 Data.

Muyun Wood argues that Commerce foreclosed any meaningful opportunity to respond to the data placed on the record and points to Commerce's letter of April 12, 2016, wherein the agency stated that it

> is placing data on the record of this new shipper review. The data consist of the sales databases of the two mandatory respondents in the second administrative review of the order on multilayered wood flooring: Dalian Dajen Wood Co., Ltd. and Jiangsu Senmao

> Bamboo and Wood Industry Co., Ltd.  Comments regarding the
> attached data must be submitted to the Department by no later than
> 5:00 PM on April 19, 2016.

See AR2 data; Pl.'s Br. at 7.  Muyun Wood asserts that Commerce did not explain in that letter

what the new information related to, or how Commerce intended to use it.  Muyun Wood notes

that it filed a letter the subsequent day, April 13, 2015, stating that it was "unable to ascertain the

relevance of the POR 2 sales data to this new shipper review," and asked Commerce to issue

Muyun Wood a supplemental questionnaire with any questions concerning their own data that

arose out of the AR2 information.  See Muyun Clarification Letter, P.R. 65.

Muyun Wood also argues that, contrary to Commerce's understanding, a case brief was

inadequate to address the use of the AR2 data, and further does not allow an opportunity to place

rebuttal information on the record.  Pl.'s Br. at 9.  Muyun Wood notes that interested parties are

permitted "one opportunity to submit factual information to rebut, clarify, or correct factual

information placed on the record of the proceeding by the Department by a date specified by the

Secretary."  19 C.F.R. § 351.301(c)(4).  Essentially, Muyun Wood argues it was meaningfully

deprived of the opportunity to submit such information "because the Department gave no

explanation for the data and Muyun Wood could not ascertain what needed rebuttal, clarification,

or correction."  Pl.'s Br. at 10.

Muyun Wood adds that it could have submitted appropriate rebuttal factual information if

Commerce had explained that it would use the AR2 data in comparison to Muyun Wood's own

data in a *bona fide* analysis.  Id. at 11.  Muyun Wood asserts that even it if had suspected that the

AR2 data would be used as part of the *bona fide* analysis, it does not entail that Muyun Wood

should have known that Commerce would use that data to compare its prices to only one of

Senmao's CONNUMs.  Id. at 12.

The Government responds that it provided a seven day period during which Muyun Wood

could comment on the AR2 sales data it placed on the record.  Def.'s Br. at 12.  The Government

asserts that Muyun Wood had the opportunity to present evidence during that period, challenge

Commerce's preliminary determination, and otherwise participate fully in the new shipper review.

The Government also notes that Commerce informed interested parties that the data consist of the

"sales databases of the two mandatory respondents in the second administrative review of the order

on multilayered wood flooring," and that upon being asked for clarification, Commerce explained

that the second review sales data could be used as part of Commerce's analysis in the new shipper

review.  AR2 data; Resp. to Clarification Request; Def.'s Br. at 12–13.  The Government points to

Muyun Wood's April 19, 2016 comments, wherein Muyun Wood argued that "sales prices that

are not contemporaneous with the new shipper POR are not relevant to or probative of market

conditions in the new shipper POR."  Muyun Wood Comments.  The Government argues that this

comment indicates Muyun Wood understood what sort of information might serve as rebuttal

factual information.  Def.'s Br. at 13.

<u>Analysis.</u>

Commerce generally has discretion to create its own rules of procedure related to the

development of the record in order to meet its statutory deadlines.  <u>PSC VSMPO–Avisma Corp.</u>

<u>v. United States</u>, 688 F.3d 751, 760–61 (Fed. Cir. 2012) (citing <u>Vt. Yankee Nuclear Power Corp.</u>

<u>v. Natural Res. Def. Council, Inc.</u>, 435 U.S. 519, 543–44 (1978) ("Absent constitutional constraints

or extremely compelling circumstances the administrative agencies should be free to fashion their

own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge

their multitudinous duties.")).  Commerce's exercise of its discretion, however, must be reasonable

in light of Commerce's statutory obligations.  <u>See</u> <u>Sterling Fed. Sys., Inc. v. Goldin</u>, 16 F.3d 1177,

1182 (Fed. Cir. 1994) (noting the agency abuses its discretion when its decision is "clearly unreasonable, arbitrary, or fanciful").   In the context of antidumping duty proceedings, while Commerce has the discretion to regulate administrative filings, that discretion is bounded at the outer limits by the obligation to carry out its statutory duty of "determin[ing] dumping margins 'as accurately as possible.'" NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (quoting Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

The court finds that Commerce's placement of the AR2 data on the record seven days prior to the factual record's closure, as well as the sparsity of explanation regarding that information's intended usage in the new shipper review -- and its resultant inability to grant Muyun Wood's request for an extension of time to respond pursuant to 19 C.F.R. § 351.302[10] due to encroaching statutory deadlines -- was unreasonable under the circumstances of this new shipper review.   While Commerce may place factual information on the record "at any time," interested parties are permitted "one opportunity to submit factual information to rebut, clarify, or correct factual information placed on the record of the proceeding by the Department by a date specified by the Secretary." 19 C.F.R. § 351.301(c)(4).   The court is not persuaded that Muyun Wood possessed a meaningful "opportunity to present evidence, challenge Commerce's preliminary determination, and otherwise participate fully in the new shipper review," Def.'s Br. at 12, because Muyun Wood was not clearly apprised of what, specifically, it was meant to rebut.   The AR2 data consists of 325

---

[10] 19 C.F.R.  § 351.302 provides, in pertinent part:

> (b) Extension of time limits. Unless expressly precluded by statute, the Secretary may, for good cause, extend any time limit established by this part.

> (c) Requests for extension of specific time limit. Before the applicable time limit established under this part expires, a party may request an extension pursuant to paragraph (b) of this section.

individual CONNUM entries, each populated with several different values, and not merely sales

prices.  See AR2 data.  Further, the data consists of the full confidential sales databases of two

companies.  Id.  Commerce's April 12 explanation that it is "placing data on the record of this new

shipper review," which "consist of the sales databases of two mandatory respondents in the record

administrative review," does not indicate which value or values -- ultimately the sales price of a

single CONNUM in the AR2 data -- would be applied.  The CONNUM ultimately selected for

comparison, meanwhile, regarded a product that was similar, but not identical, to Muyun Wood's

product.  Muyun Wood Analysis Memo at 3, P.R. 80, C.R. 61.  Nor does Commerce's reply of

April 15 to Muyun Wood's request for clarification of April 13 clarify the precise applicability of

the AR2 data; rather, Commerce summarily stated that "[t]his data may be used as part of the

Department's analysis in this new shipper review."  This statement merely iterates the obvious fact

that information that Commerce has placed in the administrative record may be used in the relevant

administrative review.  While Muyun Wood challenged the probative value of the data in its

comments, arguing that "sales prices that are not contemporaneous with the new shipper [POR]

are not relevant to or probative of market conditions in the new shipper [POR]," this recognition

by Muyun Wood of a potential use of the AR2 data in the context of a new shipper review does

not detract from the persuasiveness of its claim that more information -- and more time -- should

have been provided so that it could have further developed the record. Muyun Wood Comments.

The Government's argument that Commerce is not statutorily required to proactively

clarify that only one Senmao CONNUM would be used in its analysis is unavailing.  Def.'s Br. at

14.  The absence of a specific statutory obligation does not relieve the agency of its general duty

to execute its statutory mandates reasonably, or to provide interested parties a meaningful

opportunity to comment.  See Koyo Seiko Co. v. United States, 36 F.3d 1565, 1573 (Fed. Cir.

1994).  The court is likewise unpersuaded by the Government's argument that Muyun Wood was

adequately heard on its objections through its case brief arguments in response to the Preliminary

Results.  A case brief does not serve as a medium through which interested parties may submit

new factual information, but is intended for argument made on the basis of the factual record before

the agency.  See Tri Union Frozen Prod., Inc. v. United States, 40 CIT ___, ___, 163 F. Supp. 3d

1255, 1291–92 (2016).  Where a party has been denied the opportunity (to which it is entitled by

law and regulation) to make that factual record in the preliminary results phase, including the

opportunity to submit rebuttal information, then the case brief will necessarily be

deficient.  Compare Wuhu Fenglian Co. v. United States, 36 CIT ___, ___, 836 F. Supp. 2d 1398,

1404 (2012) (finding that Commerce's rejection of rebuttal factual information, when no deadline

existed, was unlawful in light of agency interest in accuracy).

Commerce is also obligated to calculate antidumping duty margins as accurately as

possible.  NTN Bearing Corp., 74 F.3d at 1208.  Providing interested parties a meaningful ability

to comment on the information in the record, and to submit rebuttal information if necessary, 19

C.F.R. § 351.301(c)(4), supports that endeavor.  Here, Commerce placed a large amount of data

on the record seven days prior to closing the record, and did not specify the single element of that

data that would ultimately be used in its new shipper analysis.  Muyun Wood therefore lacked the

ability to place relevant rebuttal factual information on the record, as well as a meaningful

opportunity to comment on the AR2 data.  The court cannot say this agency action was reasonable,

and accordingly finds that Commerce abused its discretion.

## II.    Commerce's Determination Is Not Supported by Substantial Evidence

Muyun Wood also argues that Commerce's determination that the sale is not *bona fide* is

not supported by substantial evidence because the slightly higher price and allegedly slightly late

payment are not unusual or atypical, and the totality of the circumstances confirms that Muyun

Wood's sale was *bona fide* and representative of its future selling practices.  Pl.'s Br. at 15.  The

Government contends that Commerce's determination is supported by substantial evidence

because Commerce "carefully evaluated the totality of the circumstances" and found that the sale

was not made at a commercially reasonable price and that the transaction deviated from

commercial norms.  Def.'s Br. at 10.  The court concludes that Commerce's decision was not

supported by substantial evidence.

<u>Analysis.</u>

*A.  Bona Fide Sales Under New Shipper Reviews.*

"In conducting a new shipper review, Commerce is essentially conducting a new

antidumping review that is specific to a particular producer.  To conduct such a review, Commerce

must determine the 'normal value and export price (or constructed export price) of each entry of

the subject merchandise.'"  <u>Tianjin Tiancheng Pharm. Co. Ltd. v. United States</u>, 29 CIT 256, 259,

366 F. Supp. 2d 1246, 1249 (2005) (citing 19 U.S.C. § 1675(a)(2)(A)).

If a sale is "unrepresentative or extremely distortive" -- in other words, not *bona fide* --

Commerce may exclude it from the export price.  <u>Id.</u> (citing <u>Am. Silicon Techs. v. United States</u>,

24 CIT 612, 616, 110 F. Supp. 2d 992, 995 (2000)).  Consequently, "where a new shipper review

is based on a single sale, exclusion of that sale as non-*bona fide* necessarily must end the review,

as no data will remain on the export price side of Commerce's antidumping duty calculation."  <u>Id.</u>

Commerce's analysis focuses on whether the sale is "commercially unreasonable" or "atypical of

normal business practices."  <u>Id.</u>

In determining whether a sale is commercially reasonable or *bona fide*, Commerce employs

a totality of the circumstances test.  <u>Id.</u> at 260.  This test has been codified in § 433 of the EAPA.

Congress noted the importance of conducting a *bona fide* sale assessment in order to prevent

companies from circumventing dumping orders:

> [An] area of abuse in new shipper reviews is for an exporter or
> producer to enter into a scheme to structure a few sales to show little
> or no dumping or subsidization when those sales are reviewed by
> the Department of Commerce during a new shipper review, resulting
> in a low or zero antidumping or countervailing duty rate for that
> producer or exporter. An importer could then bring in that producer
> or exporter's merchandise at highly dumped or subsidized prices but
> with little or no cash deposit. The problem is further exacerbated if
> the importer disappears or otherwise becomes unavailable to pay the
> duties owed and [Customs and Border Protection] has little or no
> cash deposit against which to recover the owed duties. This
> provision would prevent such arrangements by requiring that the
> U.S. sales in a new shipper review be bona fide sales and setting out
> criteria for identifying bona fide sales, reflecting the Department of
> Commerce's current regulations and practices in this area.

H.R. REP. 114-114(I).    According to statute, the factors Commerce shall consider when

determining if a sale is *bona fide* are:

> (I) the prices of such sales;

> (II) whether such sales were made in commercial quantities;

> (III) the timing of such sales;

> (IV) the expenses arising from such sales;

> (V) whether the subject merchandise involved in such sales was
> resold in the United States at a profit;

> (VI) whether such sales were made on an arms-length basis; and

> (VII) any other factor the administering authority determines to be
> relevant as to whether such sales are, or are not, likely to be typical
> of those the exporter or producer will make after completion of the
> review.

19 U.S.C. § 1675.    However, "any factor which indicates that the sale under consideration is"

atypical may be relevant "because the ultimate goal of the new shipper review is to ensure that the

U.S. price side of the antidumping calculation is based on a realistic figure." Tianjin, 366 F. Supp. 2d at 1250.

Commerce's determination under this test will be sustained unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); Changzhou Wujin, 701 F.3d at 1374.  Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence."  Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004).  "A finding is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient to support the finding."  Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir. 2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).  "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016).  This includes "contradictory evidence or evidence from which conflicting inferences could be drawn."  Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)).

In its Final Results, as explained by the IDM, Commerce determined that Muyun Wood satisfied four of the six general totality of the circumstances factors supportive of a *bona fide* commercial sale.  Commerce agreed that the quantity of Muyun Wood's sale was normal; that the short sale negotiation period was not atypical because Muyun Wood and its customer had been in communication since meeting earlier at a trade show and a sale late in the POR was not atypical; that Muyun Wood and its customer resold the subject merchandise at a profit; and that the sale was at arms-length.  IDM at 18, 23.  However, as noted, Commerce determined that the higher price (characterized as slightly higher by Muyun Wood) and allegedly late payment to Muyun

Wood were atypical, and that under the totality of the circumstances, the sale was not *bona fide*.

The court now turns to these negative determinations.

*B.  Substantial Evidence Does Not Support Commerce's Determination that the Price Was Atypical.*

Muyun Wood argues that Commerce's analysis of the price difference between its product

and the Senmao CONNUM "fails to properly consider Senmao's dumping margin, the

contemporaneity of the data, the range in Senmao's own prices, and the comparability of Senmao's

products, especially given the relatively small difference in price between Muyun Wood's entered

value and Senmao's entered value."  Pl.'s Br. at 15–16.   The Government contends that

Commerce's decision to use the Senmao CONNUM was reasonable, that its determination that

Muyun Wood's sale price was atypical is supported by substantial evidence, that Commerce was

not required to take Senmao's dumping margin into account, and that Commerce's conclusion that

the sales price differential indicated that the sale was not *bona fide* is reasonable.  Id. at 16–21.

The court concludes that Commerce's use of the Senmao data was appropriate, but that

Commerce's failure to take into account the differences between the Senmao CONNUM and

Muyun Wood's product and the decision not to adjust for Senmao's dumping margin were

unreasonable.  Further, the court is unpersuaded that Commerce's determination -- that the price

differential was atypical and evidenced that the sale was not *bona fide* -- is supported by substantial

evidence currently in the record.

The parties all agree that "differences in the product characteristics meaningfully impact

the quality and prices of the product."  Case Br. at 11–12; Def.'s Br. at 17–18; IDM at 21.  Thus,

choosing a comparison product as close to the product being reviewed and taking into account

whatever differences exist between the two products is a reasonable approach to assessing whether

the price of a sale under review is typical.

Here, Commerce selected the CONNUM in the AR2 data with the greatest number of similar characteristics -- six of seven -- as Muyun Wood's product for comparison purposes.  Def.'s Br. at 17–18; <u>IDM</u> at 10.  Muyun Wood objected that Commerce's choice of this CONNUM would not produce an accurate comparison because the AR2 data was not the most contemporaneous and because the remaining single characteristic[11] that differed between the Senmao CONNUM and Muyun Wood's product makes Muyun Wood's product more valuable than the Senmao CONNUM.  Pl.'s Br. at 16–17.  Further, Muyun Wood contends that Commerce did not take into account differences between products that affect value that were not captured by the CONNUMs, which could explain the difference in price.  <u>Id.</u> at 17.  Finally, Muyun Woods contends that Senmao had been previously found to have been dumping, and thus its prices were artificially low and could make Muyun Wood's price appear atypical in comparison.  <u>Id.</u> at 19–20.  For these reasons, Muyun Wood suggested that Commerce should have used the purchase prices provided by Muyun Wood's U.S. customer from other suppliers for the same model during the POR, or used multiple CONNUMs for comparison in order to capture the increased value caused by the differing characteristic and adjusted Senmao's prices by their dumping margin in order to better represent a fair price.  <u>Id.</u> at 16–20.

The court is not persuaded that Commerce's choice of the AR2 Senmao CONNUM was unsupported by substantial evidence.  "Where, as here, Commerce's decision is supported by a reasonable reading of record evidence . . . the court will not upset Commerce's reasonable choice among alternative data sets, even if they may be available."  <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 36 CIT ___, ___, 828 F. Supp. 2d 1345, 1354 (2012).  Commerce provided

---

[11] Muyun Wood's product [[                                              ]], while Senmao's [[
      ]].  Pl.'s Br. at 16-17.

adequate reasons for its decision to use the Senmao CONNUM:  Muyun Wood's customer did not

provide requested supporting documentation regarding its purchase prices from other suppliers;

the Senmao CONNUM had a larger number of individual sales,[12] making its sales data more

robust; it chose the CONNUM with the most similar characteristics because product characteristics

can often significantly affect the price of the product; and that the AR2 data was from the most

recent finalized proceedings, which ensured greater reliability than the more contemporaneous but

not finalized AR3 and AR4 data.  Def.'s Br. at 16–19.

However, even though Commerce agrees that "differences in the product characteristics

meaningfully impact the quality and prices of the product," it failed to account for the differences

that did exist between the Senmao CONNUM and Muyun Wood's product when determining

whether Muyun Wood's sale price was atypical.  Although Commerce's selected CONNUM had

the most product characteristics in common with Muyun Wood's product -- six out of seven -- not

all product characteristics matched, and Muyun Wood contends that this differing characteristic

makes its product more valuable than Senmao's.  Pl.'s Br. at 16–17.  Further, Muyun Wood pointed

to several of Senmao's products that also had that same characteristic and shared many other

characteristics with Muyun Wood's product, which lends credence to its claim that the differing

characteristic could help explain the small difference in price between its product and the Senmao

CONNUM.  Id. at 17.

Commerce also refused to address Muyun Wood's repeatedly stated concern that changes

in the market conditions between the AR2 POR and the POR of its sale contributed to the

difference in prices, because, per Commerce, there was no evidence in the record to support the

---

[12] [[     ]] compared to [[  ]], from only [[                    ]].

existence of "volatility" in the market and thus it need not consider this issue.  <u>IDM</u> at 9–10.

However, changes in price over time are inevitable in any industry, as Commerce implicitly

acknowledges by "generally prefer[ring] data that are more contemporaneous with the review

period"  because it more accurately reflects the market conditions at the time.  Def.'s Br. at 18;

Oral Argument.  Therefore, Commerce should have considered the potential effects of the time

difference between the AR2 POR and the Muyun Wood sale POR when determining whether

Muyun Wood's price was atypical.  Indeed, Commerce had at its disposal data that could have

shed light on changes in the price wood flooring and even the specific comparison CONNUM

itself: the AR3 and AR4 data.  Pl.'s Br. at 22.  Although Commerce reasonably prefers data from

finalized proceedings, there is no evidence in the record that the AR3 or AR4 data would be

inaccurate for evaluating whether the price of flooring changed over time.  Nor is there any

indication that there was no other way for Commerce to evaluate whether Muyun Wood's sales

price was atypical in light of the potential effects of the time difference between the AR2 and

Muyun Wood sale POR on the price of wood flooring.

        The court is also not persuaded that Commerce did not need to account for Senmao's

calculated dumping margin when evaluating whether Muyun Wood's sale price was atypical.  The

Government argues that, because the purpose of a new shipper review is to evaluate whether a

price is commercially reasonable rather than whether a product was sold for fair value, it was

reasonable not to make adjustments for Senmao's dumping.  Def.'s Br. at 19.  The distinction

between fair value and commercially reasonable is not compelling in this context: Commerce had

previously found Senmao to have been dumping -- in other words, Commerce found that Senmao

had prices that did not reflect the fair value of its products.  See <u>Multilayered Wood Flooring from</u>

<u>the People's Republic of China: Final Results of Antidumping Duty Administrative Review and</u>

**PUBLIC VERSION**

Final Results of New Shipper Review; 2012-2013, 80 Fed. Reg. 41,478 (Dep't Commerce July 15,

2015).  Commerce then compared those dumped prices to Muyun Wood's price, and determined

that Muyun Wood's price was atypical because it was higher than Senmao's artificially low

prices.  IDM at 17–18.  Because Senmao's prices are artificially low compared to the fair value of

its product, it is entirely possible -- and, perhaps, likely, in light of Senmao's 13.74% dumping

margin as identified by Commerce -- that prices for fairly traded goods would be higher in

comparison.

       The Government cites an opinion of this court, Hebei New Donghua v. United States, 29

CIT 603, 374 F. Supp. 2d 1333 (2005), for the proposition that Commerce need not -- and, in fact,

should not -- take into account Senmao's dumping margin for the purposes of determining whether

Muyun Wood's price was atypical. Under the Government's interpretation of New Donghua,

Commerce cannot compare figures that include a dumping margin with those that do not because

that would result in "a distorted comparison of two different data types."  Def.'s Br. at 20

(citing New Donghua, 374 F. Supp. 2d at 1343).  New Donghua, however, addressed a set of facts

different from those now before this court.  There, the court expressed the concern that in some

circumstances, such as were under review by that court,  accounting for the dumping margin in

determining whether a sale price was *bona fide* may give an unfair advantage to a new shipper.

However, under the different facts in the case now before this court with respect to Muyun Wood

and the multilayered wood flooring reviews -- namely, that here the AR2 respondents did not

receive an Adverse Facts Available (AFA) margin, the whole multilayered wood flooring import

market is not subject to a high AFA margin, and there are consistent annual reviews of multilayered

wood flooring -- that concern does not arise.

In sum, for these reasons, the court concludes that Commerce's analysis of Muyun Wood's price failed to consider all relevant and probative evidence -- including "contradictory evidence or evidence from which conflicting inferences could be drawn" -- and that, in the context of the circumstances as a whole, substantial evidence does not support Commerce's determination that Muyun Wood's price was atypical.  Suramerica, 44 F.3d at 985 (quoting Universal Camera Corp., 340 U.S. at 487).

C.  *Substantial Evidence Does Not Support Commerce's Determination that the Payment Timing of the Sale Was Atypical.*

Muyun Wood argues that Commerce's determination that the payment timing of Muyun Wood's sale was atypical because Muyun Wood's customer allegedly paid Muyun Wood nine days late is unsupported by substantial evidence.  Pl.'s Br. at 15.  Muyun Wood points to the fact that its invoice does not specify a due date: "payment: 100% T/T after receiving the copy of B/L" and that its questionnaire response "1=T/T after receiving the copy of B/L" reflects this fact.  Pl.'s Br. at 24; NSR Request at Exhibit 2.

The Government, however, contends that Muyun Wood's questionnaire response indicates that payment was due within thirty days.  Def.'s Br. at 21.  Commerce provides several example codes that companies can use to indicate the terms of payment in the Section C questionnaire: 1 = 30 days after invoice, 2 = 60 days after invoice, or 3 = other terms.  Muyun Wood Section C & D Resp. at 13.  The Government argues that because Muyun Wood answered "1=T/T after receiving the copy of B/L," Commerce correctly determined that the payment was due 30 days after the U.S. customer received the invoice.  Def.'s Br. at 21–22.  Since the bill of lading was issued on April 20, 2015 and payment was not received until May 29, 2015, the Government contends that Commerce's determination that the payment timing was late and therefore atypical is supported by substantial evidence.  Def.'s Br. at 21–23.

The court is unpersuaded by the Government's arguments that Commerce's determination that the payment was late is supported by substantial evidence.  First, the court notes that the codes provided by Commerce in the questionnaire to indicate sales terms are "examples only.  [Muyun Wood] need not use them."  Muyun Wood Section C & D Resp. at 13.  In fact, Muyun Wood chose to use its own codes throughout the questionnaire.  For example, Muyun Wood responded [[          ]] to "Terms of Delivery" -- the question immediately preceding "Terms of Payment" -- when the example codes provided by Commerce there were 1 = Delivered, 2 = FOB, and 3 – n = Specify other delivery terms as required.  Id. at 12–13.  There Commerce did not ignore Muyun Wood's stated answer in favor of what the code meant in the provided example; indeed, it even based its selection of the appropriate Senmao sales for comparison in part upon the fact that both sales were [[      ]], despite the fact that the number Muyun Wood used was associated with a different delivery term in Commerce's example codes.  Def.'s Br. at 18.  Yet when considering Muyun Wood's payment terms, Commerce disregarded Muyun Wood's stated answer -- "T/T after receiving the copy of B/L" -- in favor of the payment term 30 days after invoice.  Neither Commerce nor the Government provide an explanation for this inconsistency.

Further, even if the payment is considered nine days late, Commerce's determination that the timing of the payment was atypical and thus indicated that the sale was not *bona fide* is not supported by substantial evidence.  Short delays in payment, as here, are hardly atypical in international business.  See Association of Chartered Certified Accountants, Ending Late Payment, Part        3:        Reflections        on        the        Evidence        5        (2015), http://www.accaglobal.com/content/dam/acca/global/PDF-technical/small-business/pol-tp-elp-3reflections.pdf ("At least 30% of all credit-based sales in developed and emerging markets are paid outside the agreed terms, although fewer (between 16% and 21% of all credit-based sales) are

paid more than 60 days after the invoice date."). Further, in other cases where late payment supported a finding that a sale was not *bona fide*, the delay was much more extensive and multiple additional factors also indicated that the sale was atypical. For example, in <u>Tianjin</u> -- which Commerce cites in support of its conclusion that the sale was not *bona fide* because it was nine days late -- the payment was made nine <u>months</u> late, there was no evidence of collection attempts despite such a long delay, and this delay deviated from the history of payments between the company and its customer. 366 F. Supp. 2d at 1258–60, 1263. Here, by contrast, the invoice does not specify a due date and the payment was allegedly only nine days late. NSR Request at Ex. 2, Bill of Lading, Invoice; Muyun Section A Resp. at Ex. A-11 Importer's Wire Transfer Sheet, C.R. 8–10.

Furthermore, <u>Tianjin</u> suggests that Commerce must look at the degree of lateness associated with payments and the extent to which other factors suggest the sale was atypical: "[w]hile Company X had made late payments to Plaintiff before, none of its former payments were <u>as late as this</u>. . . Given the unusual sale price involved, it was not unreasonable for Commerce to look beyond the price to determine whether other characteristics of the sale were such as to demonstrate that the sale as a whole, was atypical. Late payment may be such an aspect, <u>especially</u> <u>where the payment is so late</u> . . . Company X has never been <u>quite this late</u> . . . ." <u>Tianjin</u>, 366 F. Supp. 2d at 1260–61 (emphasis added). Thus, Commerce's determination that the payment timing indicated that the sale was not *bona fide* is not supported by substantial evidence, and Commerce should reevaluate its decision on remand.

> *D. Substantial Evidence Does Not Support Commerce's Determination that, Considering the
> Totality of the Circumstances, Muyun Wood's Sale Was Not Bona Fide.*

Considering the totality of the circumstances, substantial evidence does not support Commerce's determination that Muyun Wood's sale was not *bona fide*. For the reasons discussed

above, substantial evidence does not support the conclusion that the sale price or timing of payment were atypical, and thus indicated that Muyun Wood's sale was not *bona fide*. Although Commerce also took into account the fact that Muyun Wood only had one sale during the POR, a single sale is not inherently commercially unreasonable. Tianjin, 366 F. Supp. 2d at 1263 (citing Windmill Int'l Pte., Ltd. v. United States, 26 CIT 221, 231, 193 F. Supp. 2d 1303, 1313 (2002)). Further, as has been noted, Commerce itself found that none of the other factors under the statutory *bona fide* sale test indicated that the sale was not *bona fide*: Muyun Wood and its customer had sold the subject merchandise at a profit; the quantity of the sale was normal; the negotiation of the sale was not abnormal; expenses arising from the sale were not extraordinary or unusual; and the sale was at arm's length. Confidential IDM at 2–4; PDM at 3–6. Therefore, substantial evidence does not support Commerce's determination that, considering the totality of the circumstances, Muyun Wood's sale was not *bona fide*.

## CONCLUSION AND ORDER

For the reasons stated above, the court concludes that: (1) Commerce abused its discretion by placing the AR2 data on the record so close to the comment due date without clarifying its intended use; and (2) Commerce's conclusion that Muyun Wood's sale was not *bona fide* -- and, thus the rescission of the new shipper review -- is not supported by substantial evidence on the deficient record before the court. The court remands this case for redetermination consistent with this opinion, expressing no opinion on the outcome. Commerce may, in its discretion, reopen the record. In light of the remand, the court does not need to address the arguments regarding the application of the PRC-entity rate to Muyun Wood.

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's <u>Final Results</u> is remanded to Commerce so that it may

determine whether Plaintiff's sale during the POR was *bona fide* as discussed above; it is further

**ORDERED** that Commerce shall file its remand results on or before March 6, 2018; and

it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h) and

the court's Standard Chambers Procedures.

**<u>So Ordered</u>.**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: <u>December 11, 2017</u>
          New York, New York